STATE OF NORTH CAROLINA
v.
KENNETH LATRELL REVELS
No. COA09-380.
Court of Appeals of North Carolina.
Filed: January 19, 2010.
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Catherine F. Jordan, for State.
Irving Joyner, for defendant.
ERVIN, Judge.

I. Substantive Factual Background

A. State's Evidence
At approximately 11:00 p.m. on 31 August 2007, Kimberly McCauley was on the phone inside her one-bedroom apartment when she heard a loud noise at her front door. As soon as she heard the commotion, Ms. McCauley hung up, hid in her bedroom closet, and dialed 911. While Ms. McCauley peeped through the cracks of her closet door, she observed Defendant Kenneth Revels searching her apartment. Although she had been in a volatile romantic relationship with Defendant for about two years, Ms. McCauley was not in any sort of a dating relationship with Defendant on 31 August 2007.
McCauley saw Defendant enter the bathroom and look behind the shower curtain and then look in the pantry and laundry room. From her vantage point, McCauley believed that Defendant was looking for her. After that, Defendant entered McCauley's bedroom closet, at which point he discovered her kneeling behind her clothing.
As soon as he found McCauley, Defendant grabbed her by her hair and dragged her out of the closet. Defendant took McCauley's cell phone, disconnected the call that McCauley was on, and put McCauley's cell phone in his pocket. Afterwards, he started punching McCauley's face with a closed fist and dragged her into the kitchen. As he did so, Defendant pulled McCauley's hair with such force that he detached a clump of it from her scalp. While he was hitting her, Defendant said that Ms. McCauley was cheating on him. After they reached the kitchen, Defendant forced Ms. McCauley onto the floor, at which point he began to kick her and to punch her face and head with his closed fist.
Ms. McCauley told Defendant to stop hitting her. When Ms. McCauley's cell phone rang, Defendant stopped striking her. After he finished assaulting Ms. McCauley, Defendant went to the bedroom to look for his misplaced shoe. During Defendant's absence from the room, Ms. McCauley attempted to escape through the front door. Defendant thwarted Ms. McCauley's attempted departure by grabbing her and pulling her back inside the apartment. After compelling Ms. McCauley to come back inside, Defendant left the apartment with her keys and cell phone. Ms. McCauley, in turn, exited the apartment and knocked on her neighbor's front door, at which point she discovered that someone had already called the police.
Officer Jeremy White of the Laurinburg Police Department responded to the call regarding the entry into Ms. McCauley's apartment. Upon his arrival, Officer White observed that Ms. McCauley had a baseball-sized contusion in the vicinity of her left temple, that her left eye was swollen, and that she had bruising and red marks on her left arm. Officer White testified that Ms. McCauley was distraught, upset, and had been crying. Further, he stated that Ms. McCauley indicated that her ex-boyfriend, whom she identified as Defendant, had broken into her apartment, assaulted her, stolen her cell phone, and left with her keys.
Officer White escorted Ms. McCauley back into her apartment, where he observed that the front door was split in half, that the top half was pushed in, and that the bottom half was still shut. According to Officer White, a couch was partially wedged between the door and an entertainment center and had to be forcefully moved in order for him to gain admittance to the apartment. Officer White reported that several pictures on the living room wall had been knocked down and that clothes had been dragged out of the bedroom closet and scattered across the apartment.
After speaking with Officer White, Ms. McCauley was transported to the emergency room at Scotland Memorial Hospital, where she was met by her cousin, Umeko Terry, and her mother, Rachel McCauley, and was treated by Dr. Ronald Dupler. According to Mr. Terry, there was a bald spot on Ms. McCauley's head, where some of her hair had been ripped out, and a bruise over her eye. Dr. Dupler observed a fairly large hematoma on Ms. McCauley's left forehead, tenderness of the neck, swelling of the left wrist, and a few abrasions and diagnosed McCauley as having sustained a closed-head injury with a concussion, a neck strain, and a left wrist sprain with multiple abrasions. Ms. McCauley lived with her mother for approximately a week after the incident and resided with her uncle for the following month. Ms. McCauley still does not sleep well, is afraid at night, and suffers from nocturnal flashbacks.

B. Defendant's Evidence
Defendant and Ms. McCauley had been involved in an unstable, off and on again, romantic relationship between July 2006 and August 2007. Apparently, the relationship between Defendant and Ms. McCauley had stopped and started again more than ten times. As a result of an incident that occurred in July, 2006, Defendant was incarcerated. According to Defendant's brother, Anthony Revels, Ms. McCauley visited Defendant more than ten times after Defendant's incarceration ended. In addition, Ms. McCauley called Anthony Revels' house on many occasions between July 2006 and 31 August 2007, for the purpose of speaking with Defendant or his mother. At the time that some of these visits occurred, Defendant would leave with Ms. McCauley. When the relationship between Defendant and Ms. McCauley was "off," Ms. McCauley would bring Defendant's clothes to Anthony Revels' house. Anthony Revels could not keep track of how many times this had occurred, although he knew that it had happened several times.
In addition, Defendant's aunt, Jacqueline McRae, testified that she observed Defendant and Ms. McCauley together on more than three occasions since Defendant's release from incarceration. On one occasion, Rev. McRae, who is a minister, told Ms. McCauley after Defendant's release from incarceration that she and Defendant were not going to make it. Although Rev. McRae did not discuss this conversation with Defendant, he acted angry with Rev. McRae for the next couple of weeks and eventually told Rev. McRae that he knew about her conversation with Ms. McCauley. On 4 July 2007, Ms. McCauley attended a family gathering despite the fact that she had not been invited; attempted to take a plate to Defendant, who was not present; and got angry when Rev. McRae prevented her from doing so. However, Rev. McRae admitted that she had not seen Defendant and Ms. McCauley together since 31 August 2007.

C. Procedural History
On 1 September 2007, a Warrant For Arrest was issued charging Defendant with first degree burglary, felonious larceny, and assault on a female. On 4 February 2008, the Scotland County Grand Jury returned bills of indictment charging Defendant on the charges of felonious breaking or entering, felonious larceny, assault on a female, and second degree kidnapping. On 14 July 2008, the Scotland County grand jury returned superseding indictments charging Defendant with first degree burglary, felonious larceny, assault on a female, and second degree kidnapping.
The charges against Defendant came on for trial before the trial court and a jury at the 18 August 2008 session of the Scotland County Superior Court. On 19 August 2008, Defendant pled guilty to assault on a female. On 21 August 2008, the jury found Defendant guilty of second degree kidnapping, misdemeanor larceny, and misdemeanor breaking and entering. At the sentencing hearing, the trial court found that Defendant had 21 prior record level points for felony sentencing purposes and that he should be sentenced as a Level VI offender. In addition, the trial court found that Defendant had five prior convictions for purposes of misdemeanor sentencing and that he should be sentenced as a Level III offender. Based on these determinations, the trial court sentenced Defendant to a minimum term of 54 months and a maximum term of 74 months imprisonment in the custody of the North Carolina Department of Correction for second degree kidnapping and recommended that Defendant pay $1,054.18 in restitution "as a condition of post release supervision, if applicable, or from work release earnings, if applicable" to be paid to Ms. McCauley. The trial court consolidated Defendant's assault on a female, misdemeanor breaking or entering, and misdemeanor larceny convictions for judgment and sentenced Defendant to a consecutive terms of 150 days imprisonment in the custody of the North Carolina Department of Correction. Defendant noted an appeal from the trial court's judgments to this Court on 29 August 2008.

II. Legal Analysis

A. Admissibility of "Other Bad Acts" Evidence
First, Defendant contends that the trial court erred in allowing the admission of evidence of "other bad acts," including evidence that he had committed a previous assault on Ms. McCauley that eventually led to his incarceration, that he threw a rock through the window of her home, and that he made threatening phone calls to her. After careful consideration of the record in light of the applicable law, we disagree.
The admissibility of "other bad act" evidence is governed by N.C. Gen. Stat. § 8C-1, Rule 404(b), which provides that:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence or mistake, entrapment or accident.
The list of permissible purposes for the admission of "other crimes" evidence is not exclusive, so that such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime. State v. Bagley, 321 N.C. 201, 362 S.E.2d 244 (1987), cert. denied, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). As the Supreme Court has stated, N.C. Gen. Stat. § 8C-1, Rule 404(b) is "a clear general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." State v. Coffey, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990), cert. denied, 421 S.E.2d 360 (1992) (emphasis in original). As a result, in evaluating the admissibility of "other bad act" evidence, a trial court must first determine whether the evidence is relevant to the issue of the defendant's guilt of the crime for which he or she is charged in some permissible manner. N.C. Gen. Stat. § 8C-1, Rule 401 (stating that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). "Where evidence of prior conduct is relevant to an issue other than the defendant's propensity to commit the charged offense, `the ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403.'" State v. Stevenson, 169 N.C. App. 797, 799, 611 S.E.2d 206, 209 (2005) (quoting State v. Boyd, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988)) (citation omitted). After conducting such a "relevance" analysis, "[t]he trial court must balance the probative value of the evidence against its prejudicial effect, and the determination of whether to exclude the evidence under Rule 403 is a matter within the sound discretion of the trial court." State v. Thomas, 350 N.C. 315, 357, 514 S.E.2d 486, 512, cert. denied, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999) (citing State v. Mickey, 347 N.C. 508, 518, 495 S.E.2d 669, 676, cert. denied, 525 U.S. 853, 142 L. Ed. 2d 106 (1998)).

1. Prior Assault
At trial, the trial court allowed the State to introduce evidence that Defendant broke into Ms. McCauley's home and assaulted her in July, 2006. On direct examination, Ms. McCauley testified that:
Q. Ms. McCauley, can you please tell us, ma'am, what, if anything, occurred between you and [Defendant] in July of 2006?
A. Yes, ma'am.
[Defense Counsel]: Objection.
THE COURT: Noted. Overruled.
A. In July of 2006 [Defendant] broke into my house. It was not the same residence that I was living in in August of '07. I was living in a mobile home. He broke into my door, busted my door in.
I had a couple of cousins, younger cousins that were staying-staying the night with me, and they were in the front of the house, and I was in the back of the house in my bedroom. It was around 6:30 in the morning, and I heard something busting in, like something had fell. When I looked down the hall, I saw him coming down the hall.
Q. When you say you saw "him" coming down the hall
A. Kenneth.
Q.  who did you see?
A. Kenneth. Q. [Defendant]?
A. Yes. Saw him coming down the hall, and before I could do anything, before I could get out the back door, he was already up on me. He got me in a corner that was near my bed and started beating me with his fists and busted
Q. Where was he beating you with his fists?
A. In my face, and he busted my lip.
Q. And can you tell us whether or not [Defendant] was arrested after that?
A. Yes.
Q. Could you tell us whether or not he was incarcerated after that?
A. Yes. [Defense Counsel]: Objection.
THE COURT: Overruled.
At this point, the trial court gave the following limiting instruction to the jury:
Now, ladies and gentlemen, this testimony which you have just heard regarding an incident in July of '06 at a different apartment or house occupied by the victim has been offered by the State of North Carolina for the purpose of showing, if it does, the identity of the person who committed the crime charged in this case, if it was committed; that the defendant had the intent, which is a necessary element of the crime charged in this case; that it was similar or the same pattern or a common plan or scheme as was employed in the crime charged in this case.
If you believe this evidence, then you may consider it, but you may consider it only for those limited purposes. I will repeat this instruction as is necessary in the future. Carry on.
The trial court also allowed the State to elicit evidence from Ms. McCauley that Defendant "was subsequently incarcerated" and that he was released "[i]n April of '07." At that point, the trial court instructed the jury that:
Let me stop you. Ladies and gentlemen, the testimony in evidence which you have heard regarding the incarceration of the defendant until April of 2007 has been offered by the State of North Carolina for the purpose of showing, if it does, an explanation of the absence of contact between the victim and the defendant during the time period between August of '06 and April of 2007. If you believe this testimony, you may consider it for those purposes, but you may consider it only for those purposes and not for any other. Carry on.
Finally, in its concluding instructions to the jury, the trial court reiterated these instructions, explaining to the members of the venire that:
Now, evidence has been received tending to show that during July 2006 the defendant broke into the victim's mobile home, beat her about the face with his fists, and busted her lip. This evidence was received solely for the purpose of showing, if it does, the [identity] of the person who committed the crime charged in this case, if it was committed; that the defendant had the intent which is a necessary element of the crimes charged in this case; and/or that there existed in the mind of the defendant a plan, scheme, system or design involving the crimes charged in this case. If you believe this evidence, then you may consider it but only for that limited purpose for which it has been received.
Evidence has been received tending to show that as a result of charges arising out of that alleged July 2007 incident at the victim's mobile home that the defendant was incarcerated until April of 2007. This evidence was received-I believe I referred to that incident as occurring in July 2007. It was July of 2006. Please excuse me.
This evidence regarding the incarceration from July of 2006 until April of 2007 was received for the purpose of showing, if it does, the absence of contact between the defendant and the alleged victim in this case during that time period between July of 2006 and April of 2007. If you believe this evidence, then you may consider it but only for that limited purpose for which it has been received.
On appeal, Defendant contends that the evidence concerning Defendant's incarceration following the July 2006 incident served no purpose except "to establish that [Defendant] had a violent disposition and a propensity to attack Ms. McCauley" and that the probative value of the evidence of the July 2006 incident was substantially outweighed by its prejudicial effect.
The evidentiary record shows that there are substantial similarities between Ms. McCauley's account of Defendant's assault upon her mobile home in July 2006 and her account of the events of 31 August 2007. On both occasions, Defendant "busted" down the door to Ms. McCauley's residence, searched for her, cornered her in or near her bedroom, and began beating her face and head with his fist after he found her. For that reason, Defendant does not appear to contend that the evidence of his conduct at the time that he allegedly entered Ms. McCauley's mobile home in July 2006 had no relevance to any issue other than his propensity to engage in violent conduct. Instead, Defendant argues that the trial court erred by concluding that the probative value of this evidence was not substantially outweighed by its prejudicial effect. Although Defendant supports this contention by pointing out that his identity was never in dispute and arguing that the admission of this evidence unfairly bolstered the credibility of Ms. McCauley's unsupported testimony, we are unable to agree with Defendant's argument since it ignores the importance of the evidence in question to the issue of Defendant's intent.
The extent to which Defendant confined, restrained, or removed Ms. McCauley for the purpose of terrorizing her, N.C. Gen. Stat. § 14-39)a)(3), was a hotly contested issue at trial and remains in dispute before this Court. Defendant's conduct at the time that he allegedly invaded Ms. McCauley's mobile home and attacked her in July 2006 was clearly relevant to the State's efforts to demonstrate that he acted for the purpose of instilling a "high degree of fear, a state of intense fright or apprehension," State v. Davis, 340 N.C. 1, 24, 455 S.E.2d 627, 639 (quoting State v. Moore, 315 N.C. 738, 745, 340 S.E.2d 401, 405 (1986)), cert denied, 516 U.S. 846, 133 L. Ed. 2d 83 (1995)), in Ms. McCauley on 31 August 2007. For that reason, we conclude that the trial court did not abuse its discretion by concluding that the probative value of the evidence of Defendant's conduct at the time that he entered Ms. McCauley's mobile home in July 2006 was not substantially outweighed by the risk of unfair prejudice resulting from its admission.
Furthermore, we are not persuaded by Defendant's challenge to the admissibility of Ms. McCauley's testimony that Defendant was incarcerated from July 2006 until April 2007. The history of the relationship between Ms. McCauley and Defendant was clearly relevant to the issues that were properly before the jury at Defendant's trial, including the extent to which Defendant confined, restrained, or removed Ms. McCauley for the purpose of terrorizing her. N.C. Gen. Stat. § 14-39(a)(3). In the absence of evidence tending to provide an alternative explanation, the jury might have understood the absence of evidence tending to show additional difficulties between Ms. McCauley and Defendant during the period of Defendant's incarceration in an inaccurately benign light. Given that the evidence of Defendant's incarceration provided the necessary explanation for the absence of difficulties between Ms. McCauley and Defendant during this period and given that the trial court's limiting instruction prohibited the jury from considering this portion of Ms. McCauley's testimony for any other purpose, we conclude that the trial court did not err in concluding that the evidence of Defendant's incarceration was relevant for a purpose other than showing Defendant's "propensity or disposition to commit an offense of the nature of the crime charged," Coffey, 326 N.C. at 279, 389 S.E.2d at 54, and that the trial court did not abuse its discretion by concluding that the probative value of this evidence was not substantially outweighed by risk that its admission would result in unfair prejudice to Defendant.

2. Throwing Rock Through the Window
The trial court also allowed the State to present evidence that Defendant threw a rock through a window in Ms. McCauley's residence in the months leading up to 31 August 2007. More particularly, Ms. McCauley testified that:
Q. Ms. McCauley, can you tell us what, if anything, occurred between you and [Defendant] in July 2007?
A. In July of 2007 he busted my windows in, in my apartment with a rock.
Q. And can you tell us, ma'am what time of day or night was that?
A. It was the middle of the night.
Q. And can you describe to the jury what happened?
A. I was in bed sleeping, and I heard something coming through my window. It was cracking glass. And I was scared, so I jumped on the other side of the bed, and I peeked out the side of the window, and I saw him standing down-I live on the top floor, upstairs in an apartment, and I looked down and I saw him standing outside, downstairs. And it's a well-litted (sic) area, so I could see him.
Q. Were you living in a house or an apartment?
A. Apartment.
Q. And was it on the first floor or second floor?
A. Second floor.
After Ms. McCauley testified concerning this incident, the trial court instructed the jury that:
Ladies and gentlemen, the testimony in evidence which you have heard regarding the rock being thrown through the window in July of 2007 has been offered by the State for the purpose of showing, if it does, that the defendant had the intent, which is a necessary element of the crime charged in this case; that the defendant utilized or employed a common plan or scheme to that which was utilized for the crimes charged-crime or crimes charged in this case, and the chain of circumstances leading up to and regarding the current charges for which the defendant is before the Court.
As I've told you before, if you believe this testimony in evidence, then you may consider it, but you may consider it only for those limited purposes for which it is being received. Carry on.
In addition, during its instructions to the jury at the end of the trial, the trial court informed the jury that:
Evidence has been received tending to show that on July 25 of the year 2007 the defendant threw a rock through the window of the alleged defendant's-alleged victim's apartment during the early morning hours. This evidence was received solely for the purpose of showing, if it does, that the defendant had the intent, which is a necessary element of a crime charged in this case, and/or that there existed in the mind of the defendant a plan, scheme, system or design involving the crime charged in this case. Again, if you believe this evidence, then you may consider it but only for the limited purposes for which it has been received.
Defendant contends that Ms. McCauley's evidence concerning the incident during which Defendant allegedly threw a rock through the window of her apartment in July 2007 was not sufficiently similar to the events of 31 August 2007 for that evidence to have been admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b). We disagree.
As we have previously indicated, the issue of the intent with which Defendant allegedly confined, restrained, or removed Ms. McCauley on 31 August 2007 was a sharply contested issue at trial and remains so on appeal. Ms. McCauley's testimony that Defendant engaged in another act of violence against her in the middle of the night within two months before the date upon which Defendant allegedly broke into her home and assaulted her is clearly relevant to the issue of whether Defendant acted with the intent to terrorize her on that occasion. As a result, given that the evidence that Defendant threw a rock through the window of Ms. McCauley's apartment in July 2007 was relevant to issues other than Defendant's propensity to engage in violent conduct and given the centrality of the "intent to terrorize" issue to the matters in dispute between the parties at trial and on appeal, we conclude that the trial court did not err by determining that this evidence was admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b) and that the trial court did not abuse its discretion by finding that the probative value of this evidence was not substantially outweighed by the risk that its admission would be unduly prejudicial.

3. Threatening Telephone Calls
Finally, the trial court allowed Ms. McCauley to testify on direct examination concerning certain threatening telephone calls that she had received from Defendant. Ms. McCauley testified that:
Q. Ms. McCauley, can you tell us, please, whether or not you had any contact by telephone with [Defendant] in July of 2007?
A. Yes, ma'am. Prior to the breaking in the window, he was calling me, harassing me. He called me twice and harassed me.
Q. What, if anything, did he say during those two conversations?
A. He said he was gonna kill me.
After allowing the admission of this testimony, the trial court instructed the jury that:
Ladies and gentlemen, the testimony which you have heard regarding two phone conversations during which the defendant allegedly threatened the prosecuting witness has been offered by the State for the purpose of showing the intent of the defendant which is a necessary element of the crime or crimes charged in this case and the chain of circumstances regarding the crime or crimes charged in this case.
If you believe it, you may consider it but only for those purposes. You may not consider it for any other purpose.
In addition, in its final instructions to the jury, the trial court instructed the jury that:
Evidence has been received tending to show that during July of 2007 the defendant called the alleged victim twice on the telephone, threatening to kill her. This evidence was received solely for the purpose of showing, if it does, that the defendant had the intent, which is a necessary element of the crime charged in this case, and the chain of circumstances surrounding the events alleged to have occurred on August 31, 2007. If you believe this evidence, then you may consider it but only for the limited purpose for which it has been received.
Defendant contends, once again, that Ms. McCauley's testimony that Defendant made threatening phone calls to her has no relevance except to show that Defendant "had a violent disposition." However, as was the case with the evidence that Defendant entered Ms. McCauley's mobile home in July 2006 and the evidence that Defendant threw a rock through the window of Ms. McCauley's apartment in July 2007, the evidence that Defendant made threatening phone calls to Ms. McCauley in July 2007 is clearly relevant to the issue of whether he confined, restrained, or removed Ms. McCauley on 31 August 2007 with the intent to terrorize her. N.C. Gen. Stat. § 14-39(a)(3). As a result, for the reasons set forth above in connection with Defendant's challenge to the admission of Ms. McCauley's testimony concerning the incident in which Defendant threw a rock through her apartment window, the trial court did not violate N.C. Gen. Stat. § 8C-1, Rule 404(b) by admitting evidence of these threatening phone calls or abuse its discretion by concluding that the probative value of this evidence was not substantially outweighed by its prejudicial effect.

B. Denial of Motion to Dismiss Second Degree Kidnapping Charge
Next, Defendant contends that the trial judge erred by denying his motion to dismiss the second degree kidnapping charge for insufficiency of the evidence. A motion for dismissal at the conclusion of all of the evidence pursuant to N.C. Gen. Stat. § 15A-1227(a)(2) requires a determination of
whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. . . . Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. In ruling on a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference and intendment that can be drawn therefrom. Any contradictions or discrepancies in the evidence are for the jury to resolve and do not warrant dismissal.
State v. Davis, __ N.C. App. __, __, 678 S.E.2d 709, 713 (2009) (quoting State v. Olson, 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992)). According to Defendant, the record does not contain sufficient evidence to support a jury verdict that he confined, restrained, or removed Ms. McCauley with the intent to terrorize her because, while the evidence clearly indicated that Ms. McCauley was assaulted and was afraid, she did not testify that she was "scared to death" and "her assertion did not rise to the level of being an intense or extraordinary fright or apprehension."[1] After careful consideration of the evidentiary record in light of the applicable law, we conclude that the trial court did not err in denying Defendant's dismissal motion.
"Terrorizing is defined as `more than just putting another in fear'" and means, instead, "'putting that person in some high degree of fear, a state of intense fright or apprehension.'" Davis, 340 N.C. at 24, 455 S.E.2d at 639 (citing Moore, 315 N.C. at 745, 340 S.E.2d at 405). "In determining the sufficiency of the evidence [that Defendant acted with the intent to terrorize Ms. McCauley], `the test is not whether subjectively the victim was in fact terrorized, but whether the evidence supports a finding that the defendant's purpose was to terrorize [the victim.]" Davis, 340 N.C. at 24, 455 S.E.2d at 639 (citing Moore, 315 N.C. at 745, 340 S.E.2d at 405). "The presence or absence of the defendant's intent or purpose to terrorize [] may be inferred by the fact-finder from the circumstances surrounding the events constituting the alleged crime." State v. Baldwin, 141 N.C. App. 595, 605, 540 S.E.2d 815, 821 (2000).
The evidence in the present record, when viewed in the light most favorable to the State, is more than sufficient to support the jury's determination that Defendant confined, restrained, or removed Ms. McCauley for the purpose of terrorizing her. According to the undisputed evidence, Defendant entered Ms. McCauley's home in such a violent manner that the door was split in half. After searching through the apartment in an obvious effort to locate Ms. McCauley, he found her cowering in her closet. After Defendant discovered Ms. McCauley's whereabouts, he seized her phone and put an end to her effort to obtain emergency assistance, effectively isolating her and placing her at his mercy. At that point, the record reflects that Defendant began striking Ms. McCauley in the face with a closed fist and dragged her into the kitchen using sufficient force to tear out some of her hair. After forcing her into the kitchen, Defendant forced Ms. McCauley to the floor, struck her on her head and face, and kicked her. When Ms. McCauley attempted to escape, Defendant grabbed Ms. McCauley and compelled her to come back inside the apartment. Ms. McCauley "was frightened" in the immediate aftermath of the assault. After the events of 31 August 2007, Ms. McCauley stayed with her mother for a week and with her uncle for another month and was afraid to come home until Defendant was arrested. Ms. McCauley claimed that, because of Defendant's conduct, she does not sleep well, continues to be afraid, and suffers from flashbacks at night. Wholly aside from the evidence of Defendant's "prior bad acts" on the intent issue, the evidence concerning his actions on 31 August 2007 and their impact on Ms. McCauley are indistinguishable in any material sense from the facts at issue in State v. Washington, 157 N.C. App. 534, 539, 579 S.E.2d 463, 466 (2003) (holding that the evidence was sufficient to support a finding that the defendant acted with an intent to terrorize when "defendant yelled at [victim] to `get out' of his car, shattered [victim's] car window, grabbed [victim], threw him to the ground and onto the hood of his car, and ordered [victim] to get into defendant's van" and when the victim "testified that he was scared and tried to escape from defendant"), in which this Court found the evidence sufficient to support a finding that the defendant acted with the intent to terrorize. The fact that Ms. McCauley did not testify that she was "scared to death" or that the level of violence exhibited by Defendant was not identical to that involved in other cases decided by this Court does not mean that the record evidence, taken in the light most favorable to the State, did not support a jury determination that Defendant intended to place Ms. McCauley in "a state of intense fright or apprehension." Davis, 340 N.C. at 24, 455 S.E.2d at 639. As a result, we conclude that the evidence, taken in the light most favorable to the State, is more than sufficient to support a finding that Defendant confined, restrained, and removed Ms. McCauley with the intent to terrorize her.

C. Sufficiency of the Evidence to Support Restitution Recommendation
Finally, Defendant contends that the trial court erred by recommending that Defendant pay $1,054.18 in restitution as a condition of post-release supervision or work release. In essence, Defendant contends that the record did not contain sufficient evidence to support the amount of restitution awarded by the trial court. In response, the State contends that Defendant failed to preserve this issue for appellate review by failing to object to the restitution recommendation at the time that the trial court imposed sentence and that, in any event, the trial court did not err in its restitution recommendation. After careful consideration, we conclude that the trial court erred by recommending that Defendant be required to make restitution to Ms. McCauley in the amount of $1,054.18 as a condition of post-release supervision or work release in the absence of sufficient evidence to support such a restitution award.[2]
At the conclusion of Defendant's sentencing hearing, the following colloquy occurred:
[The Court]: Anything further for the State?
[Prosecutor]: Your Honor, the State would also ask, there was one thousand, fifty-four dollars and eighteen cents in restitution due to Ms. McCauley. The State would ask that a civil judgement be entered for that amount.
The Court: A civil judgment for that amount of restitution will be entered. And should he receive the benefit of any form of work release or supervised parole, it is recommended that he be required to pay that restitution as a term and condition of the same.
Yes, ma'am?
[Prosecutor]: If I may approach with the restitution worksheet.
The Court: Further for the State or the defendant?
[Prosecutor]: No, sir.
The Court: Anything further?
[Defense Counsel: No, sir.
As a result, the record clearly reflects that the trial court entered a civil judgment against Defendant and recommended that Defendant be required to make restitution in the amount of $1,054.18 as a condition of post-release supervision or work release solely on the basis of an unsworn statement made by and an unsworn worksheet submitted by the prosecutor.
Although Defendant did not object to the trial court's recommendation that Defendant be ordered to pay $1,054.18 in restitution to Ms. McCauley as a condition of post-release supervision or work release, his failure to lodge such an objection is not, contrary to the State's argument, a bar to our consideration of Defendant's challenge to the trial court's ruling. As we clearly stated in State v. Shelton, 167 N.C. App. 225, 233, 605 S.E.2d 228, 233 (2004), although "defendant did not specifically object to the trial court's entry of an award of restitution, this issue is deemed preserved for appellate review under N.C. Gen. Stat. § 15A-1446(d)(18)." (citing State v. Reynolds, 161 N.C. App. 144, 149, 587 S.E.2d 456, 460 (2003)). See also State v. Replogle, 181 N.C. App. 579, 584, 640 S.E.2d 757 (2008). Thus, despite the State's argument to the contrary, Defendant's failure to lodge a contemporaneous objection at the time that sentence was imposed does not bar appellate review of his challenge to the trial court's restitution recommendation.
"When sentencing a defendant convicted of a criminal offense, the court shall determine whether the defendant shall be ordered to make restitution to any victim of the offense in question." N.C. Gen. Stat. § 15A-1340.34(a). "When an active sentence is imposed, the court shall consider whether it should recommend to the Secretary of Correction that restitution be made by the defendant out of any earnings gained by the defendant if the defendant is granted work-release privileges" pursuant to N.C. Gen. Stat. § 148-33.2 or whether "restitution by the defendant [should] be made a condition of any parole or post-release supervision granted the defendant" pursuant to N.C. Gen. Stat. § 148-57.1. "The amount of restitution recommended by the trial court must be supported by evidence adduced at trial or at sentencing." State v. Wilson, 340 N.C. 720, 726, 459 S.E.2d 192, 196 (1995); see also State v. Daye, 78 N.C. App. 753, 756, 338 S.E.2d 557, 560 (1986) (stating that "[a]n order of restitution as a condition of work-release must be supported by evidence adduced at trial or at sentencing") (citing State v. Killian, 37 N.C. App. 234, 238, 245 S.E.2d 812, 815-16 (1978)). "The unsworn statement of the prosecutor is insufficient to support the amount of restitution ordered." Shelton, 167 N.C. App. at 233, 605 S.E.2d at 233 (citing State v. Buchanan, 108 N.C. App. 338, 341, 423 S.E.2d 819 (1992); see also Replogle, 181 N.C. App. at 584, 640 S.E.2d at 761 (stating that "this Court has held that the `unsworn statements of the prosecutor . . . [do] not constitute evidence and cannot support the amount of restitution recommended") (quoting Buchanan, 108 N.C. App. at 341, 423 S.E.2d at 821). In addition, "there must be something more than a guess or conjecture as to the appropriate amount of restitution." Daye, 78 N.C. App. at 758, 338 S.E.2d at 561. The only basis for the amount of restitution awarded by the trial court is a figure of unknown origin supplied by the prosecutor. The State does not contend that there is any evidence in the record tending to show the appropriateness of the restitution amount established by the trial court, and we have not discovered any such evidence during our own review of the record. As a result, in accordance with well-established law, we conclude that the restitution amount established by the trial court lacks the necessary evidentiary support and cannot be sustained on appeal. Although the State contends that, since the trial court's decision is nothing more than a recommendation which the Secretary of Correction is not required to follow, State v. Wingate, 149 N.C. App. 879, 881, 561 S.E.2d 911, 914 (2002), and since the Department of Correction is required to give Defendant a chance to be heard prior to imposing restitution as a condition of work release, Wilson, 340 N.C. at 726-27, 459 S.E.2d at 196, Defendant should not receive any relief on appeal, an identical argument was expressly rejected by this Court in Daye, 78 N.C. App. at 757, 338 S.E.2d at 560 (stating that, "even though recommendations of restitution are not binding, we see no reason to interpret the statutes of this State to allow judges to make specific recommendations that cannot be supported by the evidence before them") and appears to have been implicitly rejected in Wilson, 340 N.C. at 725-27, 459 S.E.2d at 196 (vacating a recommendation that the defendant pay $4,000 in funeral expenses as a condition of work release or parole for lack of evidentiary support). Thus, we conclude that the trial court erred by recommending that Defendant be required to pay $1,054.18 in restitution to Ms. McCauley as a condition of post-release supervision or work release, reverse that portion of the trial court's judgment in the case in which Defendant was convicted of second degree kidnapping which contains that recommendation, and remand the second degree kidnapping case to the trial court with instructions to rehear the restitution issue.

III. Conclusion
As a result, we conclude that Defendant received a fair trial, free from prejudicial error, and that his convictions and his consolidated sentence for assault on a female, misdemeanor breaking or entering, and misdemeanor larceny should remain undisturbed. However, we conclude that the trial court's restitution recommendation lacks sufficient evidentiary support. As a result, we reverse that portion of Defendant's sentence for second degree kidnapping that recommends that Defendant pay $1,054.18 in restitution to Ms. McCauley as a condition of post-release supervision or work release and remand this case to the Scotland County Superior Court with instructions to rehear the issue of restitution.
NO ERROR in part; Reversed and Remanded in part.
Judges GEER and STROUD concur.
Report per Rule 30(e).
NOTES
[1] Defendant also argues in his brief that the evidence was insufficient to support a jury finding that he confined, restrained, or removed Ms. McCauley for the purpose of inflicting serious bodily injury upon her. However, since the superseding indictment returned against Defendant did not allege and the trial court's instructions to the jury did not permit the petit jury to consider the issue of Defendant's guilt of second degree kidnapping on a theory that he acted with the intent to inflict serious bodily injury on Ms. McCauley, we need not address the sufficiency of the evidence to support a finding of Defendant's guilt of second degree kidnapping on that theory.
[2] Defendant has not challenged the trial court's decision to enter a civil judgment against Defendant on appeal. As a result of the decision of the Supreme Court in State v. Jacobs, 361 N.C. 565, 648 S.E.2d 841 (2007), vacated on other grounds by 363 N.C 576, 681 S.E.2d 339 (2009) (holding that, "because there is no civil judgment in the record ordering defendant to pay attorneys fees, the Court of Appeals had no subject matter jurisdiction on this issue"), Defendant's decision to focus on the restitution issue without also addressing the civil judgment discussed by the trial court appears to reflect a correct understanding of the jurisdictional limitations under which we labor in this case.